1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESUS A VASQUEZ, | Case No. 1:20-cv-00680-SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| KILOLO KIJAKAZI[1], Acting Commissioner of Social Security, | |
| Defendant. | (Doc. 1) |
| _____/ | |

## I.        INTRODUCTION

On May 13, 2020, Plaintiff Jesus A Vasquez ("Plaintiff") filed a complaint under 42 U.S.C. §§ 405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his denying application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act").  (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

///

///

_____

[1] On July 9, 2021, Kilolo Kijakazi was named Acting Commissioner of the Social Security Administration. *See* https://www.ssa.gov/history/commissioners.html.  She is therefore substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in [their] official capacity, be the proper defendant").

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 9, 23.)

## II.      BACKGROUND

On August 2, 2016, Plaintiff protectively filed an application for SSI payment, alleging he became disabled on January 1, 2000, due to chronic severe migraines, scoliosis, attention deficit hyperactive disorder ("ADHD"), severe depression, post-traumatic stress disorder ("PTSD"), fibromyalgia, leg fatigue, bipolar disorder, and anxiety.  (Administrative Record ("AR") 20, 90, 163, 183.)  Plaintiff was born on July 26, 1991, and was 25 years old as of the application date.  (AR 31, 179.)  Plaintiff completed high school and has no past work experience.  (AR 183, 184.)

### A.      Relevant Medical Evidence[3]

#### 1.      Blanca Alvarez, LMFT

On October 8, 2016, Plaintiff presented to Blanca Alvarez, a licensed family and marriage therapist ("LMFT"), for a mental health assessment.  (AR 479.)  In her mental status examination of Plaintiff, LMFT Alvarez recorded that Plaintiff was alert, cooperative, pleasant, and had good eye contact.  (AR 482.)  She further noted that Plaintiff had linear thought process and normal thought content.  (AR 483.)  LMFT Alvarez assessed Plaintiff's problems to include flashbacks of past trauma, sad mood, anger, and "easily agitated for minor things daily throughout the day."  (AR 485.)  Her goal for Plaintiff was to work toward stabilization of emotional symptoms to less than 50 percent per day.  (AR 485.)

On October 13, 2016, Plaintiff presented for group therapy.  (AR 477.)  LMFT Alvarez noted that Plaintiff was in good spirits, talkative, and made good eye contact.  (AR 477.)  Records from another group therapy session on October 20, 2016, included similar notations.  (AR 475.)  Plaintiff was also noted to be supported of the other group member.  (AR 475.)

On October 18, 2016, Plaintiff presented for individual therapy.  (AR 476.)  Plaintiff was alert, talkative, well groomed, and in good spirits.  (AR 476.)  Plaintiff talked about how negative thoughts affected his life.  (AR 476.)

On October 27, 2016, Plaintiff presented for group therapy.  (AR 473.)  Plaintiff reported feeling numb and frustrated.  (AR 473.)  LMFT Alvarez noted that Plaintiff was fidgety, talkative,

---

[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

and tired.  (AR 473.)  Plaintiff shared that he was experiencing difficulty with controlling his emotions.  (AR 473.)  The group worked on managing emotions.  (AR 473.)

On November 3, 2016, Plaintiff presented for group therapy.  (AR 472.)  Treatment notes indicated that Plaintiff was supportive of the group process, actively listened, and disclosed his own emotional struggles and the skills he has been learning in therapy.  (AR 472.)

On November 5, 2016, Plaintiff presented for individual therapy.  (AR 466.)  Plaintiff reported feeling happy, alert, and "amazing."  (AR 466.)  LMFT Alvarez and Plaintiff worked on emotional stability and managing emotions.  (AR 466.)

On November 8, 2016, Plaintiff presented for individual therapy.  (AR 465.)  Notes from the session recorded that Plaintiff was hyperactive, manic, talkative, fidgety, and alert.  (AR 465.)  Plaintiff stated that he felt "happy, hypered [sic]."  (AR 465.)  LMFT Alvarez noted that Plaintiff appeared to present with difficulty concentrating.  (AR 465.)

On November 28, 2016, Plaintiff presented for individual therapy.  (AR 462.)  Plaintiff reported feeling calm.  (AR 462.)  LMFT Alvarez noted that Plaintiff was talkative, receptive, and alert.  (AR 462.)

On December 8, 2016, Plaintiff presented for group therapy and reported feeling worried.  (AR 458.)  Plaintiff "actively listened" to the other group member and shared his own struggles with anger.  (AR 458.)

On December 13, 2016, Plaintiff presented for group therapy.  (AR 456.)  Plaintiff described his mood as "manic."  (AR 456.)  LMFT Alvarez noted that Plaintiff presented as fidgety, talkative, and supportive of other groups members exploring emotions.  (AR 456.)  Therapy notes indicated that the group presented as happy toward the end of the session.  (AR 456.)

On January 5, 2017, Plaintiff presented for group therapy.  (AR 451.)  Notes from the session recorded that Plaintiff was cooperative, talkative, and "emotionally reactive."  (AR 451.)  Plaintiff shared that he was having difficulty managing mania, which had a negative effect on his "daily life level of functioning."  (AR 451.)

On January 26, 2017, Plaintiff presented for group therapy, reporting that he was feeling "better."  (AR 448.)  At an individual therapy session on January 31, 2017, Plaintiff made a similar

report.  (AR 445.)  LMFT Alvarez noted that Plaintiff was talkative, "in good spirits," and "emotionally regulated."  (AR 445.)

On February 7, 2017, Plaintiff presented for individual therapy.  (AR 443.)  Plaintiff was tired but talkative.  (AR 443.)  Plaintiff and LMFT Alvarez worked on targeting symptoms of Plaintiff's depression.  (AR 443.)  On February 14, 2017, Plaintiff presented for individual therapy.  (AR 442.)  He described his mood as "level headed," and LMFT Alvarez noted that Plaintiff had good eye contract and was alert, talkative, and oriented.  (AR 442.)

On February 27, 2017, Plaintiff presented for a brief group therapy session, at which Plaintiff described his mood as "frustrated," but he presented as talkative and supportive of the new group process.  (AR 440.)

On March 6, 2017, at another group therapy session, Plaintiff described his mood as "with back pain and all over the place."  (AR 439.)  LMFT Alvarez noted that Plaintiff had "a positive attitude about his treatment" and shared five positive qualities about himself, including that he was "outgoing, spontaneous, and [a] social butterfly."  (AR 439.)

At a group therapy session on March 13, 2017, Plaintiff shared that he was feeling "manic" and "down."  (AR 438.)  Therapy notes recorded that Plaintiff "seemed talkative and supportive" of the other individual.  (AR 438.)

On March 27, 2017, Plaintiff "identified his mood as 'agitated' [and] 'all over the place'" at a group therapy session.  (AR 437.)  LMFT Alvarez noted the Plaintiff "presented in positive spirits" and was talkative and receptive throughout the session.  (AR 437.)

On April 12, 2017, Plaintiff presented for an individual therapy appointment.  (AR 436.)  LMFT Alvarez noted that Plaintiff was "hyperactive, fidgety, talkative, and scattered with thoughts of multiple subjects/areas in his own life."  (AR 436.)

On August 14, 2017, Plaintiff presented for individual therapy.  (AR 554.)  Plaintiff was talkative, well groomed, and had good eye contact.  (AR 554.)  A recorded goal was to increase Plaintiff's "level of functioning."  (AR 554.)

On August 29, 2017, Plaintiff presented for individual therapy.  (AR 552.)  He was talkative, well groomed, and attentive.  (AR 552.)

On September 12, 2017, Plaintiff presented for group therapy.  (AR 551.)  Plaintiff reported feeling frustrated.  (AR 551.)  LMFT Alvarez noted that Plaintiff was talkative, alert, and in good spirits, and that he was "receptive of the group process."  (AR 551.)

On September 26, 2017, Plaintiff presented for group therapy.  (AR 550.)  Plaintiff reported feeling bored and lethargic.  (AR 550.)  Therapy notes indicated that Plaintiff was talkative and well groomed.  (AR 550.)  During the session, Plaintiff expressed emotional struggle with controlling fear, negative thoughts, and nightmares throughout the day.  (AR 550.)

### 2.    Bio-Behavioral Medical Clinics, Inc.

On June 23, 2017, Plaintiff presented to Bio-Behavioral Medical Clinics, Inc., complaining of depression, anxiety, PTSD, and bipolar disorder.  (AR 538.)  Sean Peng, a psychiatric mental health nurse practitioner ("N.P."), performed an initial psychiatric evaluation of Plaintiff.  (AR 538.)  Upon examination, N.P. Peng noted that Plaintiff was well-groomed and dressed appropriately.  (AR 539.)  Plaintiff was calm, cooperative, and pleasant, and his speech was normal, productive, and spontaneous. (AR 539.)  Examination notes also indicated that Plaintiff's mood was depressed, with a broad affect.  (AR 539.)  Plaintiff had fair insight and judgment.  (AR 539.)  N.P. Peng diagnosed Plaintiff with bipolar disorder, chronic PTSD, and ADHD.  (AR 539.)  N.P. Peng recommended that Plaintiff continue with medications prescribed by his previous provider, in addition to Adderall and Latuda.  (AR 539.)  N.P. Peng discussed Plaintiff's case with Kenneth A. Steinbach, M.D., the attending physician, who agreed with N.P. Peng's assessment and plan.  (AR 539.)

On July 7, 2017, Plaintiff presented for a follow-up appointment.  (AR 544.)  He reported that Latuda "works 'amazing'" and denied any unwanted side effects.  (AR 544.)  Plaintiff also reported that he had episodes of irritability and anger the day before but was feeling "better" overall.  (AR 544.)  A mental status examination by N.P. Plaintiff yielded similar findings to that of Plaintiff's initial psychiatric evaluation.  (AR 544.)  Plaintiff was directed to continue with his current medication regimen and to follow up in two weeks.  (AR 544.)  N.P. Peng discussed Plaintiff's case with Dr. Steinbach, who agreed with N.P. Peng's assessment and plan.  (AR 544.)

At an appointment on July 21, 2017, Plaintiff reported he was experiencing mood swings and felt anxious and restless.  (AR 537.)  Upon examination, N.P. Peng again noted that Plaintiff

was well-groomed, dressed appropriately, calm, and cooperative.  (AR 537.)  Plaintiff had normal speech and intact thought process, cognition, and sensorium.  (AR 537.)  N.P. Peng also found that Plaintiff had fair insight and judgment.  (AR 537.)  Plaintiff's mood was noted as "'mood swings,' with broad affect."  (AR 537.)  N.P. Peng discontinued Latuda for Plaintiff, as it may have been causing him to experience akathisia.  (AR 537.)

On August 4, 2017, Plaintiff indicated that he continued to have mood swings and that he "snaps on accident."  (AR 536.)  N.P. Peng's mental status examination findings were identical to those from Plaintiff's July 21, 2017, appointment.  (AR 536.)  N.P. Peng adjusted the dosage of one of Plaintiff's medications.  (AR 536.)

On August 18, 2017, Plaintiff reported to N.P. Peng that he was "doing well" with his current medication and was no longer experiencing mood swings.  (AR 535.)  Mental status examination findings remained unchanged, except that Plaintiff's mood was "better."  (AR 535.)  On September 15, 2017, and October 13, 2017, Plaintiff again reported he was doing well and had no complaints.  (AR 534.)  The only change to Plaintiff's mental status examinations was that Plaintiff's mood was neutral, with a congruent affect.  (AR 533, 534.)

On November 30, 2017, Plaintiff presented for a follow-up appointment and reported that "everything [wa]s good" and he had no complaints.  (AR 532.)  Plaintiff also indicated he had been more productive lately and was "buying and selling stuff on ebay again."  (AR 532.)  Mental status examination findings remained unchanged at this appointment and at subsequent appointments on December 14, 2017, and January 18, 2018.  (AR 530, 531, 532.)  At the latter appointment, Plaintiff reported that his medications were "kicking in, and he felt more motivated, not depressed.  (AR 530.)  Plaintiff stated that he was still selling stuff on ebay.  (AR 530.)  Plaintiff also stated that he was planning on taking a trip to Tokyo and getting a car soon.  (AR 530.)

On April 20, 2018, Plaintiff reported feeling anxiety, impaired concentration, nightmares, mood swings, and depression.[4]  (AR 528.)  He requested that his medication be adjusted because he was experiencing daytime sedation.  (AR 528.)  Plaintiff was found to have an anxious mood, with fair insight and judgment and intact memory and orientation.  (AR 528.)

---

[4] At this appointment, Plaintiff was seen by Natalie A. Hanes, RN, FNP.  (AR 528.)

On June 20, 2018, Plaintiff presented for another follow-up.  (AR 527.)  He requested that his medications be adjusted again, as one of them was making him more anxious.  (AR 527.)  Plaintiff indicated that his medications were otherwise helping, and his mood was stable.  (AR 527.)  Upon examination, N.P. Peng noted that Plaintiff was well-groomed, dressed appropriately, calm, and cooperative.  (AR 527.)  Plaintiff had normal speech and intact thought process, cognition, and sensorium.  (AR 527.)  N.P. Peng also found that Plaintiff's insight and judgment were unimpaired.  (AR 527.)  Plaintiff's mood was neutral with a congruent, full affect.  (AR 527.)

### 3.    Valley Health Team

On May 30, 2018, Plaintiff presented to Valley Health Team to establish care.  (AR 510.)  Treatment notes indicated that Plaintiff was "[c]urrently asymptomatic except for intermittent blurry vision."  (AR 510.)  Plaintiff was found to be oriented with appropriate mood and affect.  (AR 514.)  Plaintiff did not have mood swings, memory loss, or obsessive thoughts.  (AR 514.)  His judgment, attention span, and concentration were all normal.  (AR 514.)

### 4.    Turning Point

On July 10, 2018, Plaintiff presented to Turning Point, where a core assessment was performed.  (AR 506–09.)  Upon examination, Plaintiff was found to be well groomed, with behavior within cultural norms.  (AR 507.)  The examiner noted that Plaintiff was cooperative and engaging.  (AR 508.)  It was further noted that Plaintiff had adequate social skills, in addition to fair memory, abstraction, interpretation, judgment, and insight.  (AR 508.)  No diagnosis was given.  (*See* AR 508–09.)

### 5.    David Glassmire, Ph.D., ABPP

On November 21, 2018, at the request of the Administrative Law Judge ("ALJ"), Dr. Glassmire, a psychologist, completed interrogatories based on Plaintiff's medical evidence provided to him.  (AR 586–92.)  Dr. Glassmire assessed Plaintiff with bipolar disorder, ADHD, and PTSD.  (AR 591.)   According to Dr. Glassmire, Plaintiff had mild limitations in understanding, remembering, or applying information, and adapting or managing oneself; and moderate limitations in interacting with others, and concentrating, persisting, or maintaining pace.  (AR 592.)  Dr.

1  Glassmire opined that Plaintiff was limited to non-complex routine tasks, no interaction with the

2  public, and only occasional tasks requiring teamwork.  (AR 592.)

3        **B.      Plaintiff's Adult Function Report**

4        On September 4, 2016, Plaintiff completed an adult function report, describing how his

5  impairments limited his activities.  (AR 207–15.)  Plaintiff indicated that he lived in a house with

6  his family.  (AR 207.)  His illnesses included "debilitating migraine headaches" that last for a few

7  weeks, "cluster" headaches, mood swings, and non-epileptic seizures.  (AR 207.)  With regard to

8  his personal care, Plaintiff indicated that he sometimes has problems with getting dressed, and no

9  problems with bathing, shaving, caring for hair, and using the toilet.  (AR 208.)  He does not need

10 help or reminders to take care of his personal needs/grooming or taking medication.  (AR 209.)

11 According to Plaintiff he "lock[s] [him]self in [his] room for days."  (AR 208.)

12       Plaintiff is able to prepare sandwiches and microwave meals prepared by his mother.  (AR

13 209.)  He is unable to cook, and he sometimes forgets to eat.  (AR 208–09.)  Plaintiff also indicated

14 that he is able to do laundry, but it takes him all day.  (AR 209.)  Plaintiff goes outside once a week

15 for 30 minutes or for medical appointments.  (AR 210.)  He is able to drive a car and go out alone.

16 (AR 210.)  Plaintiff goes shopping in stores and online about twice a month for food or clothes, but

17 he finds it "very stressful to shop."  (AR 210.)  Plaintiff also indicated that he is able to pay bills,

18 handle a savings account, and count change, but he cannot use a checkbook or money orders.  (AR

19 210.) According to Plaintiff, he has no hobbies and interests, and he does not spend time with others,

20 though he has no problems getting along with family, friends neighbors, or others.  (AR 211–12.)

21 Before he turned 23 years old, Plaintiff was able to socialize and "do activities," but now he feels

22 worse.  (AR 211.)

23       Plaintiff indicated that his impairments affected his following abilities: walking, sitting,

24 talking, seeing, completing tasks, concentration, memory, understanding, following instructions,

25 and getting along with others.  (AR 212.)  Plaintiff explained that he can pay attention for only ten

26 minutes and is unable to follow written instructions.  (AR 212.)  Plaintiff also indicated that he is

27 unable to get along well with authority figures.  (AR 213.)  He cannot handle stress or changes in

28 routine, stating that " stress turns into pain."  (AR 213.)

C.     **Administrative Proceedings**

The Commissioner initially denied Plaintiff's application for SSI benefits on October 7, 2016, and again on reconsideration on December 23, 2016.  (AR 91, 101.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 108.)  At the hearing on August 22, 2018, Plaintiff appeared with counsel and testified before an ALJ as to his alleged disabling conditions.  (AR 44–59.)

Plaintiff testified that he experiences depression, and when he is unable to control it, he "start[s] losing reality."  (AR 50.)  This occurs about two to three times a month, with each episode lasting about a week.  (AR 51.)  Plaintiff also experiences periods of isolation.  (AR 51.)  In 2016 and 2017, Plaintiff was isolated for nine months.  (AR 51.)  During these episodes, Plaintiff calls his psychiatrist, who advises him to take his antidepressants, which Plaintiff indicated "helps a lot." (AR 52.)  When Plaintiff is experiencing isolation, he is "constantly in [his] room."  (AR 52.)  He tries to shower daily but sometimes forgets.  (AR 52.)

Plaintiff further testified that he has problems with his mood and concentration.  (AR 54, 55.)  According to Plaintiff, he does not watch television, play games, or read.  (AR 56.)  Plaintiff has a driver's license, but he does not drive because his family does not have a car.  (AR 58.) Plaintiff testified that he has been living with his parents since 2015.  (AR 47.)  From 2013 to 2015, he tried living in Santa Barbara, but he "got sick out there and everything just fell apart[.]"  (AR 47.)  Plaintiff attends therapy every week, and he sees his psychiatrist every month to two months, depending on how stable he is.  (AR 48.)

Plaintiff also testified that he had problems with migraines, which "make[] everything horrible."  (AR 57.)  Plaintiff stated that the migraines were constant, but their "magnitude" fluctuated.  (AR 58.)

D.     **The ALJ's Decision**

In a decision dated May 16, 2019, the ALJ found that Plaintiff was not disabled, as defined by the Act.  (AR 20–33.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920.  (AR 22–33.)  The ALJ determined that Plaintiff had not engaged in substantial gainful activity since August 2, 2016, the application date (step one).  (AR 22.)  At step two, the ALJ found

Plaintiff's following impairments to be severe: bipolar II disorder, attention deficit hyperactivity disorder ("ADHD"), post-traumatic stress disorder ("PTSD"), headaches, and seizures.  (AR 22.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three).  (AR 23.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at steps four and five.  *See* 20 C.F.R. § 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps.").  The ALJ determined that Plaintiff had the RFC

> to perform a full range of work at all exertional levels.  [Plaintiff] is precluded from working in hazardous work environments such as working at unprotected heights, operating dangerous machinery, driving commercial vehicles, and working around open flames.  [Plaintiff] is able to perform simple routine tasks in a work environment that stays from day to day regarding surroundings and tasks. [Plaintiff] can have occasional contact with the public and perform occasional tasks that require teamwork.  [Plaintiff] is unable to perform jobs that require hyper-vigilance or watching out for the safety of others.

(AR 24.)  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" she rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record[.]"  (AR 23.)

The ALJ determined that Plaintiff had no past relevant work (step four).  (AR 31.)  The ALJ ultimately concluded that, given his RFC, Plaintiff was not disabled because Plaintiff could perform a significant number of other jobs in the national economy, specifically yard laborer, hand packer, and call filler (step five).  (AR 32–33.)

On June 3, 2019, Plaintiff sought review of the ALJ's decision before the Appeals Council, which the Appeals Council denied on March 10, 2020.  (AR 3, 9.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1481.

### III.   LEGAL STANDARD

#### A.   Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is

unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* at § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920.  The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments.  If not, the claimant is not disabled.  If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.  If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy.  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also* 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants).  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)).  "However, if a claimant establishes an inability to continue [his] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

## B.     Scope of Review

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)).  "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)).  Harmless error "exists when it is clear from the record

that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Circ. 2008) (quoting *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."  *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.      DISCUSSION

Plaintiff contends that the ALJ erred in discounting N.P. Peng's opinion, LMFT Alvarez's opinion, and Plaintiff's testimony.  (Doc. 19 at 12–28.)  For the reasons set forth below, the Court finds that the ALJ did not err.

### A.      The ALJ Properly Evaluated N.P. Peng's and LMFT Alvarez's Opinions

#### 1.      Legal Standard

The ALJ must consider and evaluate every medical opinion of record.  *See* 20 C.F.R. § 416.927 (applying to claims filed before March 27, 2017); *Mora v. Berryhill*, No. 1:16–cv–01279–SKO, 2018 WL 636923, at *10 (E.D. Cal. Jan. 31, 2018).  This includes opinions from "acceptable medical sources" like physicians, as well as "other" evidence.  *See* 20 C.F.R. § 416.927(a)(1), (f).  In doing so, the ALJ "cannot reject [medical] evidence for no reason or the wrong reason."  *Mora*, 2018 WL 636923, at *10 (citation omitted).

Cases in this circuit distinguish between three types of acceptable medical opinions: (1) those given by a physician who treated the claimant (treating physician); (2) those given by a physician who examined but did not treat the claimant (examining physician); and (3) those given by a physician who neither examined nor treated the claimant (non-examining physician).  *Fatheree v. Colvin*, No. 1:13–cv–01577–SKO, 2015 WL 1201669, at *13 (E.D. Cal. Mar. 16, 2015).  "To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions."  *Cooper v. Astrue*, No. CIV S–08–1859 KJM, 2010 WL 1286729, at *2 (E.D. Cal. Mar. 29, 2010).  An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons.  *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995).  In contrast, a contradicted opinion of a treating or examining professional may

1  be rejected for "specific and legitimate reasons that are supported by substantial evidence." *Trevizo*

2  *v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing *Ryan*, 528 F.3d at 1198); *see also Lester*, 81

3  F.3d at 830–31.  "The ALJ can meet this burden by setting out a detailed and thorough summary of

4  the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."

5  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

6  Nurse practitioners, in turn, are considered "other sources," for claims filed before March

7  27, 2017, as are licensed marriage and family therapists.  *See* 20 C.F.R. § 416.902(a); *Steven T. v.*

8  *Saul*, No. CV 18–07369–DFM, 2019 WL 6310263, at *2 (C.D. Cal. Nov. 22, 2019) ("As a licensed

9  marriage and family therapist, Young is considered an 'other source,' and thus the ALJ could reject

10  his testimony by giving 'reasons germane' for doing so.") (citation omitted).  "Other sources cannot

11  establish the existence of a medically determinable impairment" but can provide "special knowledge

12  of the individual and . . . insight into the severity of the impairment(s) and how it affects the

13  individual's ability to function."  SSR 06-03P (2006).  A provider deemed an "other source" is

14  entitled to less deference, and "[t]he ALJ may discount testimony from these other sources if the

15  ALJ gives reasons germane to each witness for doing so."  *Molina*, 674 F.3d at 1111 (internal

16  citations omitted).

17  It is undisputed that the "germane" reasons standard applies in evaluating LMFT Alvarez's

18  opinion.  (*See* Doc. 19 at 23; Doc. 20 at 6.)  The parties, however, dispute the standard by which

19  N.P. Peng's opinion is to be evaluated.  (*See* Doc. 19 at 18; Doc. 20 at 2–4; Doc. 21 at 1–2.)

20  Defendant contends that, because N.P. Peng is an "other source," the ALJ needed only to provide a

21  "germane" reason for rejecting his opinion.  (Doc. 20 at 2–4.)  Relying on *Gomez v. Chater*, 74 F.3d

22  967 (9th Cir. 1996), Plaintiff asserts that the Court should apply the "specific and legitimate"

23  standard to N.P. Peng's opinion because N.P. Peng was "working under the supervision of an

24  attending physician, Kenneth A. Steinbach, M.D.," who would be an acceptable medical source.[5]

25  (Doc. 19 at 18.)

26

---

27  [5] N.P. Peng's opinion is contradicted by that of Dr. Glassmire, who opined that Plaintiff had: mild limitations in
   understanding, remembering, or applying information, and adapting and managing oneself; and moderate limitations in

28  interacting with others, and concentrating, persisting, or maintaining pace.  (AR 592.)  The ALJ assigned "greatest
   weight" to Dr. Glassmire's opinion.  (AR 31.)

In *Gomez*, the Ninth Circuit held that "other" sources constitute an acceptable medical source where they work in conjunction with a physician as part of an interdisciplinary team.  *Gomez*, 74 F.3d at 971.  The Court notes that the subsection of the regulation providing the basis for the *Gomez* holding was deleted by amendment in 2000, and an "interdisciplinary team" was removed from the definition of "acceptable medical sources."  *See Hudson v. Astrue*, No. CV–11–0025–CI, 2012 WL 5328786, at \*4 (E.D. Wash. Oct. 29, 2012); *Farnacio v. Astrue*, No. 11–CV–065–JPH, 2012 WL 4045216, at \*6 (E.D. Wash. Sept. 12, 2012).  The Ninth Circuit has yet to directly address whether *Gomez* still remains good law.  *See Molina*, 674 F.3d at 1112 n.3 (declining to address the question of *Gomez*'s continuing vitality because the physician's assistant in that case "acted alone"); *Colburn v. Berryhill*, 694 F. App'x 582, 583 (9th Cir. 2017) (court assumed "without deciding" that *Gomez* remains good law).

The Court finds that it is unnecessary to decide whether *Gomez* is still applicable because the record does not definitively establish that N.P. Peng was working closely enough with Dr. Steinbach to trigger *Gomez*'s narrow exception.  *See Register v. Astrue*, No. CV–10–2749–PHX–LOA, 2011 WL 6369766, at \*10 (D. Ariz. Dec. 20, 2011) ("*Gomez* does not stand for the proposition that any medical professional, who would not otherwise be considered an 'acceptable medical source,' is transformed into such a source merely because [he or] she works on a treatment team, or is supervised to any degree by a physician.  Rather, *Gomez* instructs that there must be evidence of such close supervision that the 'other source' becomes the agent of the 'acceptable medical source.'"); *Ramirez v. Astrue*, 803 F. Supp. 2d 1075, 1081 (C.D. Cal. 2011) (noting that the exception espoused in *Gomez* applies in "rare circumstances").

It is unclear from the record whether Dr. Steinbach personally observed or examined Plaintiff.  N.P. Peng performed the initial psychiatric evaluation of Plaintiff on June 23, 2017, and then discussed Plaintiff's case with Dr. Steinbach, who "[a]gree[d] with [N.P. Peng's] assessment and plan" and co-signed the treatment record.  (AR 539.)  For all of Plaintiff's subsequent follow-up appointments, a nurse practitioner, primarily N.P. Peng, evaluated Plaintiff.  (*See* AR 527–37, 544.)  The only indications of Dr. Steinbach involvement in Plaintiff's care are notations on the treatment records that the records have been "[e]lectronically approved by: Kenneth A Steinbach

MD," except for one record dated July 7, 2017, which includes the same note from the initial psychiatric evaluation—that the case and plan had been discussed with Dr. Steinbach—and his wet signature.  (AR 527–37, 544.)  This evidence is insufficient to support that N.P. Peng was working so closely with Dr. Steinbach so as to be his agent; thus, N.P. Peng is not an acceptable medical source.  *See, e.g.*, *Ramirez*, 803 F. Supp. 2d at 1082 (reasoning that a physician's co-signature on client-plan prepared by a social worker did not indicate that the social worker was under close supervision of the physician in treating or in preparing the reports; thus, the social worker's evaluation was not an "acceptable medical source").  Furthermore, the questionnaire submitted by N.P. Peng setting forth his opinion regarding Plaintiff's limitations was not signed by Dr. Steinbach. (*See* AR 558–62.)  *See Mack v. Astrue*, 918 F. Supp. 2d 975, 983 (N.D. Cal. 2013) (finding that social worker was not an acceptable medical source where the mental impairment questionnaire at issue was prepared and signed by only the social worker); *cf. Swanson v. Comm'r of Soc. Sec. Admin.*, 274 F. Supp. 3d 932, 936–37 (D. Ariz. 2017) (finding nurse practitioner to be an acceptable medical source where the supervising physician co-signed the medical source statement prepared by the nurse practitioner.)

Accordingly, the Court concludes that the ALJ needed to give only a germane reason for rejecting N.P. Peng's and LMFT Alvarez's opinions.

**2.  Analysis**

**a.  LMFT Alvarez**

Plaintiff contends that the ALJ failed to provide a germane reason for rejecting LMFT Alvarez's opinion. (Doc. 19 at 22–26.)  The record indicates that LMFT Alvarez saw Plaintiff from October 2016 to April 2017.  (*See* AR 434–85.)  On November 14, 2016, LMFT Alvarez submitted a mental residual function capacity questionnaire on behalf of Plaintiff, opining that Plaintiff had severe limitations on mental functioning.  (AR 414–16, 421–23.)  For example, LMFT Alvarez rated several of Plaintiff's mental abilities as falling within "Category IV," which was defined as "[p]recludes performance for 15% or more of an 8-hour work day (15% = 72 minutes)," including his ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances; accept instructions and respond appropriately to critics [sic] from supervisors; and respond appropriately to changes in the work setting.  (AR 414–16, 421–23.)

In assigning "little weight" to LMFT Alvarez's opinion, the ALJ explained:

> [LMFT Alvarez's opinion] is inconsistent with her own treating records as well as the overall record that reflects essentially normal mental status evaluations. [Plaintiff] was able to participate and even lead some sessions in group therapy, he bought and sold on eBay to earn money.  Most importantly, [Plaintiff's] treatment records support very stable mental health symptoms controlled with medications.

(AR 28.)[6]

A conflict with treatment notes or inconsistency with the medical record as a whole are germane reasons to reject an "other source" opinion.  *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014).  Here, the ALJ determined that LMFT Alvarez's restrictive limitations were inconsistent with her own therapy notes and the overall medical record.  (AR 28.)  The notes cited by the ALJ recorded that LMFT Alvarez often described Plaintiff as alert (*see* AR 442, 462, 476, 551), oriented (*see* AR 442, 475), attentive, receptive (*see* AR 437, 441, 462, 552), well groomed (*see* AR 476, 550, 552, 554), and in good spirits (*see* AR 437, 445, 475, 476, 477, 551) at his individual and group therapy sessions.  Additionally, notes from Plaintiff's group therapy sessions indicated that Plaintiff was regularly supportive of other group members (*see* AR 438, 456, 475), actively listened (*see* AR 458, 472), and "supportive of the group process" in general (*see* AR 440, 472, 551).  The Court concludes that these findings rationally support the ALJ's determination that LMFT Alvarez's own notes did not support the degree of her assessed limitations, including, for example, that Plaintiff was severely limited in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness (*see* AR 415, 422 (selecting "Category IV" for that mental function)).

Other medical evidence identified by the ALJ also fails to support LMFT Alvarez's opined limitations.  As the ALJ pointed out, the record supports that Plaintiff had generally normal and unremarkable mental status evaluations.  (AR 26.)  For example, a core assessment of Plaintiff

---

[6] The Court notes that the ALJ's observation that Plaintiff was able to "even lead some sessions in group therapy" appears to mistakenly attribute LMFT's Alvarez's guidance of the group to Plaintiff.  (*See, e.g.*, AR 440, 451, 456.)

1    performed in July 2018 yielded a normal mental status evaluation, and no diagnosis was given.  (AR

2    506–09.)  In particular, Plaintiff was found to be well groomed, with behavior within cultural norms.

3    (AR 507.)  The examiner noted that Plaintiff was cooperative and engaging.  (AR 508.)  It was

4    further noted that Plaintiff had adequate social skills, in addition to fair memory, abstraction,

5    interpretation, judgment, and insight.  (AR 508.)  Findings from mental status examinations

6    performed by N.P. Peng between June 2017 and June 2018 were also generally normal.  (*See* AR

7    527–44.)  Plaintiff was found to be well-groomed and dressed appropriately at his appointments,

8    and N.P. Peng consistently noted that Plaintiff was calm, cooperative, and pleasant, with normal

9    speech and fair insight and judgment.  (*See* AR 527, 530–37, 539, 544.)

10        The ALJ also rejected LMFT Alvarez's opined limitations because Plaintiff's mental health

11    symptoms were controlled by medication.  (AR 26.)  "Impairments that can be controlled effectively

12    with medication are not disabling for the purpose of determining eligibility for [disability] benefits."

13    *Warre v. Comm'r*, 439 F.3d 1001, 1006 (9th Cir. 2006).  The record shows that Plaintiff repeatedly

14    reported improvement in his symptoms with his various medications and adjustments thereto.  For

15    example, in July 2017, Plaintiff reported that one of his medications worked "amazing," and that he

16    was feeling better overall.  (AR 544.)  The following month, in August 2017, Plaintiff reported that

17    he was "doing well" with his current medications and that he was no longer experiencing mood

18    swings.  (AR 535.)  In September, October, and November 2017, Plaintiff reiterated that he was

19    doing well and had no complaints.  (AR 523–34.)  In January 2018, Plaintiff told N.P. Peng that he

20    felt "more motivated, not depressed" as a result of his medications, so much so that he was planning

21    to take a trip to Tokyo and get a car soon.  (AR 530.)  In June 2018, Plaintiff requested that his

22    medications be adjusted, as one of them was making him more anxious.  (AR 527.)  Plaintiff

23    indicated that his medications were otherwise helping, and his mood was stable.  (AR 527.)

24    Accordingly, substantial evidence supports the ALJ's finding that Plaintiff's mental health

25    symptoms were effectively controlled by medication, and this was a germane reason to reject LMFT

26    Alvarez's opinion.  *See, e.g.*, *Britnee B. v. Saul*, No. C20–5480–MAT, 2021 WL 807677, at *4

27    (W.D. Wash. Mar. 3, 2021) ("Plaintiff's ability to effectively control her diabetes is a germane

28    reason to reject limitations attributed to it.").

In sum, the ALJ determined that LMFT Alvarez's opinion was unsupported by her own treatment notes and the broader medical record.  The ALJ also found that Plaintiff's symptoms were controlled by medication.   These are germane reasons supported by substantial evidence for discounting LMFT Alvarez's opinion.  *See Ghanim*, 763 F.3d at 1161; *Warre*, 439 F.3d at 1006.  As the Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner, it will not disturb the ALJ's finding on this basis, even if, as Plaintiff suggests (*see, e.g.*, Doc. 19 at 23–15), some of the above-described evidence could be construed more favorably to him.  *See Robbins*, 466 F.3d at 882; *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) ("Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld"); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) ("When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ.").

### b.  N.P. Peng

Plaintiff also claims that the ALJ erroneously rejected the opinion of N.P. Peng.  (Doc. 19 at 12–26.)  The record reflects that N.P. Peng treated Plaintiff from June 2017 to June 2018.  (*See* AR 527–44.)  In a questionnaire completed on Plaintiff's behalf on August 23, 2018, N.P. Peng opined to significant limitations in mental functioning.  (AR 558–62.)

The ALJ "did not place significant weight in" N.P. Peng's opinion, explaining:

> [Plaintiff's] treating providers completed some questionnaires indicating opinions that he had significant functional limitations that would preclude him from working. [LMFT Alvarez] opined that [Plaintiff] would be precluded from most workplace functions for 15% or more of the day . . . . [N.P. Peng] indicated in a similar opinion regarding [Plaintiff] and also opined that [Plaintiff] had extreme limitations in Understanding, Remembering, and Applying Information, as well as marked limitations in Concentration, Persistence and Pace.  These opinions provided by [Plaintiff's] treatment providers are inconsistent with their own treatment notes . . . , which indicate only mild to moderate symptomology and a generally stable mental status throughout the relevant time.

(AR 29) (internal citations omitted).

As with LMFT Alvarez's opinion, inconsistency with one's own treatment notes was a germane reason for the ALJ to disregard N.P. Peng's opinion.  *See Ghanim*, 763 F.3d at 1161.  As discussed above, findings from N.P. Peng's mental status examinations of Plaintiff between June

2017 and June 2018 were generally normal and unremarkable. (*See* AR 527–44.)  Treatment notes indicated that Plaintiff was well-groomed and dressed appropriately at his appointments, in addition to being calm, cooperative, and pleasant, with normal speech and fair insight and judgment. (*See* AR 527, 530–37, 539, 544.)  These findings reasonably support the ALJ's determination that the degree of limitations to which N.P. Peng opined was unsupported by his own treatment notes.  Although Plaintiff can identify medical evidence that can be construed in his favor (*see* Doc. 19 at 12–22), "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas*, 278 F.3d. at 954 (citation omitted).  Inconsistency with the broader medical record, and that Plaintiff's mental health symptoms were controlled by medication, as discussed above, were additional germane reasons for the ALJ to reject N.P. Peng's opinions.  *See Molina*, 674 F.3d at 1114 ("[I]f the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness.") (citations omitted).  Therefore, the Court finds that the ALJ properly rejected N.P. Peng's opinion.

### B.  The ALJ Properly Evaluated Plaintiff's Statement and Testimony

#### 1.  Legal Standard

In evaluating the credibility of a claimant's testimony regarding their impairments, an ALJ must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Id*.  The claimant is not required to show that their impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id*. (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if they give "specific, clear and convincing reasons" for the rejection. *Id*.  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other

1
2

> testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

3   *Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v.*

4   *Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226–27 (9th Cir. 2009).  Other factors the ALJ may

5   consider include a claimant's work record and testimony from physicians and third parties

6   concerning the nature, severity, and effect of the symptoms of which he complains.  *Light v. Social*

7   *Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

8        The clear and convincing standard is "not an easy requirement to meet," as it is "'the most

9   demanding required in Social Security cases.'"  *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir.

10  2014) (quoting *Moore v. Comm'r of Social Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).  General

11  findings are not sufficient to satisfy this standard; the ALJ "'must identify what testimony is not

12  credible and what evidence undermines the claimant's complaints.'"  *Burrell v. Colvin*, 775 F.3d

13  1133, 1138 (9th Cir. 2014) (quoting *Lester*, 81 F.3d at 834)).

14             **2.    Analysis**

15       The ALJ reviewed Plaintiff's adult function report and testimony and concluded that

16  Plaintiff's statements were "credible to the extent that [Plaintiff] [could] do the work" falling within

17  the ALJ's RFC determination.  (AR 30.)  Although the ALJ found that Plaintiff's "medically

18  determinable impairments could reasonably be expected to cause the alleged symptoms," the ALJ

19  also found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of

20  these symptoms are not entirely consistent with the medical evidence and other evidence in the

21  record for the reasons explained in this decision."  (AR 31.)  Since the ALJ found that Plaintiff's

22  "medically determinable impairments could reasonably be expected to cause the alleged

23  symptoms," the only remaining issue is whether the ALJ provided "specific, clear and convincing

24  reasons" for Plaintiff's adverse credibility finding.  *See Vasquez*, 572 F.3d at 591.  As discussed

25  below, the ALJ properly discounted Plaintiff's testimony because it was unsupported by the

26  objective medical evidence of record and inconsistent with his treatment and activities.  (AR 30,

27  31.)

28

### a.  Objective Evidence of Record

"[T]he Ninth Circuit has repeatedly emphasized that, 'in evaluating the credibility of . . . testimony after a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of [the impairment].'"  *Ondracek v. Comm'r of Soc. Sec.*, No. 1:15–cv–01308–SKO, 2017 WL 714374, at *8 (E.D. Cal. Feb. 22, 2017) (quoting *Burch*, 400 F.3d at 680); *see, e.g.*, *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (a claimant's testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence").  Nonetheless, "lack of medical evidence . . . is a factor that the ALJ can consider in his credibility analysis."  *Burch*, 400 F.3d at 681.

The ALJ discounted Plaintiff's statements and testimony regarding his symptoms and limitations, including "problems related to migraines, mood swings and non-epileptic seizures" because "the treating records do not support the level of symptoms as reported by [Plaintiff.]"  (AR 30, 31.)  The ALJ provided sufficient support for this conclusion.  (*See* AR 23–25.)  As discussed above, the vast majority of Plaintiff's mental status examinations were normal.  (*See, e.g.*, AR 506–09, 527–44.)  Treatment notes from Plaintiff's group therapy sessions in October 2016 to August 2017 recorded that Plaintiff was attentive and an active listener, and that Plaintiff supported other members in the group.  (*See,* e.g., AR 437, 438, 441, 456, 462, 475, 552).  In July 2018, Plaintiff's judgment, attention span, and concentration were all found to be normal.  (AR 514.)  It was reasonable for the ALJ to conclude that these generally unremarkable mental findings did not support Plaintiff's testimony about the severity of his condition and alleged limitations, including, for example, his limited ability to focus and concentrate.  (*See* AR 55–56.)  Thus, the Court finds that the ALJ properly considered inconsistency with the objective evidence as one of several "clear and convincing" reasons to discount Plaintiff's credibility.  *See Salas v. Colvin*, No. 1:13–cv–00429–BAM, 2014 WL 4186555, at *6 (E.D. Cal. Aug. 21, 2014).

### b.  Plaintiff's Activities

It is appropriate for an ALJ to consider a claimant's activities that undermine claims of severe limitations in making the credibility determination.  *See Fair v. Bowen*, 885 F.2d 597, 603

1  (9th Cir. 1989); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999); *Rollins*,

2  261 F.3d at 857; *see also Thomas*, 278 F.3d at 958–59 (an ALJ may support a determination that

3  the claimant was not entirely credible by identifying inconsistencies between the claimant's

4  complaints and the claimant's activities.).   It is well-established that a claimant need not "vegetate

5  in a dark room" to be deemed eligible for benefits.  *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir.

6  1987).  However, if a claimant can spend a substantial part of their day engaged in pursuits involving

7  the performance of physical functions that are transferable to a work setting, a specific finding as to

8  this fact may be sufficient to discredit an allegation of disability.  *Fair*, 885 F.2d at 603.  "Even

9  where [Plaintiff's] activities suggest some difficulty functioning, they may be grounds for

10 discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating

11 impairment."  *Molina*, 674 F.3d at 1113.

12      Plaintiff alleges an inability to work due in part to numerous limitations on his mental

13 functioning as a result of his headaches, depression, and ADHD.  (AR 207, 210, 212.)  For example,

14 Plaintiff alleged he is able to pay attention for only ten minutes.  (AR 212.)  In evaluating Plaintiff's

15 credibility, however, the ALJ cited activities that were inconsistent with Plaintiff's testimony about

16 the severity of his symptoms and impairments.   Observing that Plaintiff indicated in his adult

17 function report that he had a driver's license and drove (AR 210)[7], the ALJ reasoned that Plaintiff's

18 ability to drive "shows concentration and persistence, and an ability to deal with the stress inherent

19 in the operation of a motor vehicle."  (AR 31.)  In addition, as the ALJ noted and the record reflects,

20 Plaintiff is able to prepare simple meals, care for his hygiene, do "some laundry," go out alone, and

21 manage his own finances.  (AR 30, 208–10.)

22      The Court finds that Plaintiff's activities were reasonably considered by the ALJ to be

23 inconsistent with his alleged inability to work due to his mental health symptoms.  (AR 26.)  Even

24 if some of these activities do not rise to the level of transferable work skills, they are, as a whole,

25 inconsistent with allegations of completely debilitating impairment.  *Molina*, 674 F.3d at 1113.

26 Accordingly, the inconsistencies between Plaintiff's activity level and his complaints constituted a

27

28 [7] The Court notes that Plaintiff testified at the hearing that he did not drive, not because of any limitations on mental functioning but because he and his family did not have a car.  (AR 58.)

1    clear and convincing reason to find Plaintiff's testimony not credible.   *See* 20 C.F.R. §

2    416.929(c)(3); *Stubbs-Danielson v. Astrue*, 539 F.3d 1168, 1175 (9th Cir. 2008).

3                      **c.   Plaintiff's Treatment**

4          In evaluating a claimant's claimed symptoms, an ALJ may find a plaintiff less credible when

5    his or her symptoms can be controlled by medication.   *See* 20 C.F.R. § 416.929(c)(3)(iv); *see also*

6    *Warre*, 439 F.3d at 1006 ("Impairments that can be controlled effectively with medication are not

7    disabling for purposes of determining eligibility for SSI benefits.").   Here, the ALJ reasoned that

8    Plaintiff's testimony was not fully consistent with the treatment he had received (*see* AR 30), and

9    there is substantial evidence in the record that Plaintiff is adequately functional when medicated.

10         As discussed above, Plaintiff reported he was doing well with his medications on several

11   occasions.   (*See, e.g.*, AR 523–35, 544.)   In particular, in January 2018, Plaintiff reported feeling

12   "more motivated, not depressed" as a result of his medications, and that he was planning on taking

13   a trip to Tokyo and getting a car soon.   (AR 530.)   Plaintiff's improvement with medication is

14   therefore a clear and convincing reason for discounting his subjective symptom testimony.   *Morgan*,

15   169 F.3d at 599 (the ALJ's adverse credibility determination properly accounted for physician's

16   report of improvement with medication); *Hives v. Colvin*, No. 2:14–cv–2953–CKD, 2016 WL

17   336200, at *11 (E.D. Cal. Jan. 28, 2016) (finding that the ALJ's determination that the plaintiff's

18   impairments were well-controlled with medication was a clear and convincing reason for

19   discounting the plaintiff's subjective claim that her impairments caused her to be disabled).   *See*

20   *also Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983) (affirming denial of benefits and noting that

21   the claimant's impairments were controlled with medication).

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   *///*

## V.       CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, and against Plaintiff Jesus A Vasquez.

IT IS SO ORDERED.

Dated:   **March 17, 2022**                          /s/ *Sheila K. Oberto*
                                                        UNITED STATES MAGISTRATE JUDGE